IN UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Michele Caver, )<br>)<br>   Plaintiff, )<br>v. )<br>)<br>Union Pacific Railroad Company and )<br>)<br>Justin Anderson, )<br>)<br>   Defendants. ) | Case No. 1:21-cv-01485<br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

Plaintiff, Michele Caver ("Caver"), by and through her legal counsel, Pietrucha Law Firm, LLC, states as follows for her Complaint of Employment Discrimination against the Defendants, Union Pacific Railroad Company ("Union Pacific") and Justin Anderson ("Anderson") (collectively the "Defendants").

## INTRODUCTION

1. Caver brings this action for employment discrimination on the basis of race and sex under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq. ("Title VII") and 42 U.S.C § 1981 ("Section 1981"), and employment discrimination on the basis of age under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA").

## PARTIES AND JURISDICTION

2. Caver is a resident of Cook County, Illinois. At all relevant times to the Complaint, Caver was an employee of Union Pacific as defined by Title VII, Section 1981 and the ADEA.

3. Union Pacific is a foreign corporation which conducts business in Cook County, Illinois, including freight and commuter operations. At all relevant times, Union Pacific was Caver's employer as defined by Title VII, Section 1981 and the ADEA.

4. At all relevant times, Anderson was an Union Pacific manager. Anderson is a resident of the state of Illinois and is Caucasian/white.

5. Jurisdiction over Caver's Title VII, Section 1981 and ADEA claims is conferred by 28 U.S.C. §1331 and §1343(a)(l), and 42 U.S.C. § 1981.

## FACTS

6. Caver, an African-American/black female/woman over age 40, is a transportation operations professional.

7. In July 2008, Union Pacific hired Caver, as a manager of yard operations.

8. Caver excelled at Union Pacific, and within seven years she moved up the ranks to be Sr. Manager Terminal Operations:

| Caver's Employment History With Union Pacific ||
| --- | --- |
| Dates | Job Title |
| 2008 to 2011 | Manager Yard Operations |
| 2011 to 2012 | Manager Terminal Operations |
| 2012 to 2014 | Manager Train Operations |
| 2015 to 2017 | Sr. Manager Terminal Operations *(Houston, Texas)* |
| 2017 to 2019 | Sr. Manager Terminal Operations (Dayton, Texas) |
| 2019 to 2020 | Manager Terminal Operations *(Rochelle, Illinois)* |

9. By March 2019, Union Pacific underwent a company reorganization which impacted Caver. As part of the reorganization human resources told Caver that at no fault of her own, Caver's then role, Sr. Manager Terminal Operations, would end. Union Pacific then offered Caver 2 options to move forward, either accept a severance package or accept a demotion from Sr. Manager Terminal Operations to Manager Terminal Operations.

10. Caver, while in her 50's, accepted the demotion, relocated from Texas to Illinois, and began working as Manager Terminal Operations at Union Pacific's Rochelle, Illinois location ("Global 3" or "G3").

11. Despite the demotion, Caver excelled in her new role as a non-senior manager at Global 3 as she was overqualified for the role.

12. Caver's job duties including supervising a small group of ground workers to ensure compliance with Union Pacific's policies, procedures and applicable regulations.

13. At all relevant times, Caver met or exceeded Union Pacific's legitimate expectations. She had not been written up, disciplined or counseled regarding her job performance at Global 3 prior to Union Pacific's and Anderson's discriminatory conduct. To the contrary, prior to Anderson's investigation, Caver earned accolades, promotions and bonuses reflective of her exemplary performance.

14. In final months of Caver's employment, Union Pacific acknowledged and praised Caver for her excellent job performance at Global 3:

| Caver's Awards and Recognition based on her Global 3 Job Performance | |
|---|---|
| **Date** | **Union Pacific's Accolades** |
| October 3, 2019 | Letter of recognition for outstanding performance from General Manager stating *"We are recognizing your work ethic, professionalism, and commitment to our customers"* and *"Improvements you and team have made at G3 are amazing"*. |

| | |
|:---:|:---:|
| December 23, 2019 | UP Way Certificate for Caver's for "*demonstrated knowledge and application of tools and techniques necessary to enable continuous improvement*" |
| February 10, 2020 | Payment to Caver - $12,000 MIP Award |
| March 31, 2020 | Letter of recognition for outstanding performance from General Manager stating "*On 02/03/2020 there was a derailment at Global 3 and you gave step by step instruction on how to deal with such a difficult situation…Your action illustrated what it means to be a true leader and mentor*". |
| June 18, 2020 | Letter of recognition for outstanding performance from General Manager stating "…*you are always there for us any time of the day. Your work ethic and leadership inspires me…*" and "*Keep up the good work !!!*" |

15. Nonetheless, Union Pacific singled Caver out based on a sham investigation led by Anderson, an investigation which led to Union Pacific terminating Caver on September 24, 2020.

16. Union Pacific attributed the termination to phony performance deficiencies conducted by Caver on September 11, 2020 during a certification ride ("Certification Ride"), while Union Pacific tolerated the same or worse performance from non-Black men, and Anderson replaced Caver with a younger, Caucasian/white male.

17. The Certification Ride, conducted by Caver on September 11, 2020, required Caver to observe a Caucasian/white male/man Union Pacific conductor, Thomas Hobbs ("Hobbs"), while a Federal Railroad Administration Operating Practice Safety Inspector ("FRA Inspector") named Robert Ferrari ("Ferrari") watched.

18. During the Certification Ride:

   a. Ferrari served as the FRA Inspector.

    b. Caver completed her observation of Hobbs under Ferrari's eyes while complying with safety protocol, including but not limited to:

        i. Taking extra care to walk across rocky, uneven terrain near the rails;

        ii. Staying mindful of railcars; *and*

        iii. Maintaining COVID-19 social distancing as Hobbs had recently been off of work due to COVID-19.

    c. Ferrari left several times during his observation to observe other workers.

    d. Caver stood on the south side of the engine where she could see Hobbs link up tilt and hang test.

    e. Ferrari spent between 5 and 10 minutes facing north of where Caver and Hobbs were standing, and Ferrari then departed.

    f. Caver was aware that if there was an issue with Hobbs' Certification Ride, Ferrari would discuss it with her, as he had done with past concerns followed by the formal complaint.

    g. Ferrari did not discuss any issues with Caver on this day.

19. On that same day, September 11, 2020, Caver also:

    a. Rode alongside Hobbs to make sure he maintained proper contact and rang the bell as he was going over crossings.

    b. Asked Ferrari if he needed anything from her, and when Ferrari responded asking about the utility conducting a "class 1", Caver indicated that it was just about to start and Ferrari left to check on an air test.

  c. Later, again asked Ferrari if he needed anything from her, and when Ferrari responded asking whether the Certification Ride was over and completed, Caver told him the Certification Ride was just about done.

  d. Saw Ferrari end his observations by telling Caver the inspection was okay and Ferrari waved goodbye.

  e. Rode alongside Hobbs to monitor his positioning riding the equipment and his dismount.

20. After the Certification Ride was completed, Anderson led an investigation into Caver's alleged performance deficiencies during the Certification Ride.

21. At least one other African-American/black Union Pacific employee has accused Anderson of initiating and leading a sham investigation, which led to the African-American/black employee's termination and replacement by a Caucasian/white employee.

22. First, by telephone, Union Pacific informed Caver on September 14, 2020, that she was being placed on paid administrative leave. This information was communicated by Caver's supervisor, Jason Reed ("Reed") but Reed declined to tell Caver why she was being placed on leave.

23. On Tuesday, September 15, 2020, Reed contacted Caver to notify her of a scheduled in-person meeting with Caver, Anderson and Reed scheduled for Thursday, September 17, 2020. Caver confirmed she could attend the meeting in two days, and Reed revealed to Caver that there was an unidentified issue with the Certification Ride she completed on September 11, 2020, and that the issue allegedly is what led to Caver's placement on administrative leave.

24. On September 17, 2020, Caver reported to a conference room with Reed and Anderson, while 5 other Union Pacific employees not disclosed to Caver when the meeting was scheduled, joined the meeting by telephone.

25. Despite Caver's full cooperation, during the meeting Union Pacific:

   a. Alleged Ferrari complained about Caver's Certification Ride with Hobbs;

   b. Left Caver in the dark regarding her employment status and the details of Ferrari's alleged complaint;

   c. Did not produce a copy of Ferrari's alleged complaint, even though Union Pacific has shared like complaints with other employees so that appropriate corrections can be made;

   d. Allowed Anderson to take lead, with Anderson asking Caver the most questions and interrogating Caver about the Certification Ride;

   e. Did not include Ferrari in the meeting.

26. Based on Anderson's alleged findings, on September 24, 2020, Union Pacific terminated Caver via a telephone call from management and human resources.

27. On information and belief, the Certification Ride was never emitted from Union Pacific's tracking system, even though it is Union Pacific's practice to purge or re-do problematic certification rides, meaning it's unlikely the alleged reasons for Caver's termination are true.

28. On information and belief, Caver's replacement is a younger Caucasian/white male, named Spencer Taylor ("Taylor"), who is Anderson's son-in-law and has less than tenure, qualifications and experience than Caver.

29. Caver has found herself disadvantaged in her efforts to retain employment, her long-term unemployment has deteriorated her morale and she has lost her home and was forced to relocate and move-in with family members, leaving the bulk of her possessions in storage.

30. On November 30, 2020, Caver filed Equal Employment Opportunity Commission ("EEOC") Charge No. 440-2020-06968, which the EEOC shared with Pete Jeyaram, Union Pacific's Director of EEO/AA, and wherein Caver indicated the following (*See Exhibit A*):

> DISCRIMINATION BASED ON (Check appropriate box(es).)
> [X] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
> [ ] RETALIATION  [X] AGE  [ ] DISABILITY  [ ] GENETIC INFORMATION
> [ ] OTHER (Specify)
>
> DATE(S) DISCRIMINATION TOOK PLACE
> Earliest: 09-24-2020   Latest: 09-24-2020
> [ ] CONTINUING ACTION
>
> THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):
>
> I began my employment with Respondent in or around July 2008. My most recent position was Manager-Train Operations. On or about September 24, 2020, I was discharged for an incident while younger, male, non-Black employees were not discharged for the same or similar incident.
>
> I believe that I have been discriminated against because of my age, 53 (YOB: 1966), in violation of the Age Discrimination in Employment Act of 1967, as amended.
>
> I believe that I have been discriminated against because of my sex, female, and race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

31. On December 18, 2020, the EEOC issued Caver a Notice of Right to Sue (*See Exhibit B*).

<u>**COUNT I**</u>
<u>**RACE DISCRIMINATION UNDER TITLE VII**</u>
<u>**(Against Union Pacific)**</u>

32. Caver repeats and re-alleges Paragraphs 1-31 as though fully set forth herein.

33. Caver is an African/American-black female/woman.

34. Caver's performance awards and recognition prove Union Pacific's termination decision was inadequately supported by alleged misconduct.

35. Prior to Union Pacific's discriminatory conduct, Caver was qualified for her position, and met Caver's legitimate expectations.

36. Caver's performance awards and recognition prove Union Pacific's termination decision was inadequately supported by alleged misconduct.

37. Title VII prohibits an employer from discriminating against an employee "because of such individual's … race." 42 U.S.C. § 2000e-2(a)(1).

38. Union Pacific discriminated against Caver on the basis of her race by disciplining her and terminating her for the same behavior allowed by similarly situated Caucasian/white employees as they were not subject to the mistreatment set forth in the foregoing paragraphs.

39. As a result of Union Pacific's violations of federal law, Caver was harmed physically, mentally, and financially.

WHEREFORE, Caver respectfully prays that judgment be entered in her favor and against Caver with respect to Count I and requests that this Honorable Court award Caver:

A. A Finding that Union Pacific's actions constitute race discrimination in violation of Title VII;

B. Value of all lost compensation and benefits as a result of Union Pacific's unlawful conduct;

C. Value of compensation and benefits she will lose in the future as a result of Union Pacific's unlawful conduct;

D. Damages for emotional distress;

E. Damages for pain and suffering;

F. Compensatory damages;

G. Punitive damages;

H. An Order that Union Pacific stop any discriminatory practices and take steps to prevent discrimination in the future;

I. Reasonable attorney's fees; and

J. Award such other relief, including interest, as the Court deems just and proper.

## COUNT II
## RACE DISCRIMINATION UNDER SECTION 1981
### (Against All Defendants)

40. Caver repeats and re-alleges Paragraphs 1-39 as though fully set forth herein.

41. Caver is an African/American-black female/woman.

42. Caver's performance awards and recognition prove Defendants' termination decision was inadequately supported by alleged misconduct.

43. Prior to Defendants' discriminatory conduct, Caver was qualified for her position, and met Defendants' legitimate expectations.

44. Caver's performance awards and recognition prove Defendants' termination decision was inadequately supported by alleged misconduct.

45. Defendants' discriminated against Caver on the basis of her race by disciplining her and terminating her for the same behavior allowed by similarly situated Caucasian/white employees as they were not subject to the mistreatment set forth in the foregoing paragraphs.

46. As a result of Defendants' violations of federal law, Caver was harmed physically, mentally, and financially.

WHEREFORE, Caver respectfully prays that judgment be entered in her favor and against Defendants' with respect to Count II and requests that this Honorable Court award Caver:

A. Enter a finding that Defendants' actions constitute race discrimination in violation of Section 1981;

B. Value of all lost compensation and benefits as a result of Defendants' unlawful conduct;

C. Value of compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

D. Damages for emotional distress;

E. Damages for pain and suffering;

F. Compensatory damages;

G. Punitive damages;

H. An Order that Union Pacific stop any discriminatory practices and take steps to prevent discrimination in the future;

I. Reasonable attorney's fees; and

J. Award such other relief, including interest, as the Court deems just and proper.

## COUNT III
## SEX/GENDER DISCRIMINATION UNDER TITLE VII
## (Against Union Pacific)

47. Caver repeats and re-alleges Paragraphs 1-46 as though fully set forth herein.

48. Caver is female/woman.

49. Prior to Union Pacific's discriminatory conduct, Caver was qualified for her position, and met Caver's legitimate expectations.

50. Caver's performance awards and recognition prove Union Pacific's termination decision was inadequately supported by alleged misconduct.

51. Title VII prohibits an employer from discriminating against an employee "because of such individual's … sex." 42 U.S.C. § 2000e-2(a)(1).

52. Union Pacific discriminated against Caver on the basis of her sex/gender by disciplining her and terminating her for the same behavior allowed by similarly situated male/man employees as they were not subject to the mistreatment set forth in the foregoing paragraphs.

53. As a result of Union Pacific's violations of federal law, Caver was harmed physically, mentally, and financially.

WHEREFORE, Caver respectfully prays that judgment be entered in her favor and against Union Pacific with respect to Count III and requests that this Honorable Court award Caver:

A. A finding that Union Pacific's actions constitute sex/gender discrimination in violation of Title VII;

B. Value of all lost compensation and benefits as a result of Union Pacific's unlawful conduct;

C. Value of compensation and benefits she will lose in the future as a result of Union Pacific's unlawful conduct;

D. Damages for emotional distress;

E. Damages for pain and suffering;

F. Compensatory damages;

G. Punitive damages;

H. An Order that Union Pacific stop any discriminatory practices and take steps to prevent discrimination in the future;

I. Reasonable attorney's fees; and

J. Award such other relief, including interest, as the Court deems just and proper.

### COUNT IV
### AGE DISCRIMINATION UNDER ADEA
### (Against Union Pacific)

54. Caver repeats and re-alleges Paragraphs 1-53 as though fully set forth herein.

55. Caver was 54 years old at the time she was fired from the manager terminal operations position with Union Pacific.

56. The ADEA makes it unlawful for employers and their agents "to fail or refuse to hire . . . any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1).

57. Caver was qualified for the position of manager terminal operations.

58. A significantly younger, less qualified individual was hired to replace Caver.

59. Union Pacific's violations of the ADEA were intentional and willful.

60. As a direct and proximate result of the foregoing violations of the ADEA, Caver has sustained economic and non-economic damages, including, but not limited to, denial of the wages and other benefits, lost interest on those wages and other benefits, and loss of any potential opportunity to advance within Union Pacific.

WHEREFORE, Caver respectfully prays that judgment be entered in her favor and against Union Pacific with respect to Count IV and requests that this Honorable Court award Caver:

A. A finding that Union Pacific's actions constitute age discrimination in violation of the ADEA;

B. Value of lost wages, employment benefits, and other compensation lost to her as a result of Union Pacific's unlawful conduct, and prejudgment interest;

C. Value of compensation and benefits she will lose in the future as a result of Union Pacific's unlawful conduct;

D. Liquidated damages doubling the award of interest, wages, lost employment benefits, and other compensation lost to her as a result of Union Pacific's discriminating against her based on age.

E. Reinstatement to the job of manager of terminal operations (or to a comparable job) and backpay

F. Compensatory damages;

G. Punitive damages;

H. Reasonable attorney's fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

I. Such other relief that this Court deems just and appropriate.

## JURY DEMAND

61. Plaintiff demands a trial by jury.

                                    Respectfully submitted:

                                    Michele Caver

*/s/ Cynthia N. Pietrucha*
Cynthia N. Pietrucha
One of Her Attorneys

Cynthia N. Pietrucha
PIETRUCHA LAW FIRM, LLC
1717 N. Naper Blvd., Suite 200
Naperville, Illinois 60563
(630) 806-8610
cpietrucha@pietruchalaw.com
ARDC # 6315653